## OATES v. CAMP.
### No. 3977.

Circuit Court of Appeals, Fourth Circuit.
April 6, 1936.

David P. Wolhaupter, of Washington, D. C. (Frederick S. Stitt, of Washington, D. C., and Williams, Mullen & Hazelgrove and Fielding L. Williams, all of Richmond, Va., on the brief), for appellant.

K. Wilson Corder, of Atlanta, Ga., and Edwin S. Clarkson, of Washington D. C. (Spalding, Sibley, Troutman & Brock, John A. Sibley, and Robert B. Troutman, all of Atlanta, Ga., on the brief), for appellee.

·Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a decree holding Camp patent No. 1,793,673, for a road guard, valid and infringed. The defendant does not here contest the validity of the patent, except as to claim 10, which is said to be too broad; but contends that in view of the prior art, the claims should be construed as limited) to the precise instrumentality described in the specifications and drawings, and that when so limited they are not infringed by the road guard of the defendant. The court below held that the patent of complainant constituted an important contribution to the art and was entitled to liberal treatment; that the device of defendant accomplished the same result in substantially the same way; and that, in application of the doctrine of equivalents, this device should be held an infringement of the patent. We think that this holding was correct.

The evidence leaves no doubt that complainant. was the first to solve the problem of providing an effective road guard for use under modern traffic conditions. With the coming of the high speed motorcar and the hard surface highway, guards embodying devices of the old fence making art were obviously insufficient; and attempts to provide an efficient guard by the use of cable, wire mesh, and metallic rail failed to solve satisfactorily the problem presented and were in most cases abandoned. Most of the patents which these attempts brought forth remained mere paper patents; and the use made of the others is hardly worthy of mention. Complainant solved the problem by the use as a guard rail of a wide flexible band of sheet steel, maintained under longitudinal tension, and fastened to the supporting posts by offset springs in such a way, as to provide a substantially smooth continuous surface to meet the impact of the motor vehicle and to oppose to the force of the collision the resilience, not alone of the guard rail, but also of the springs by which it was held under tension. The invention met with immediate success and within a short while was being used on the highways of a large number of the states of the Union. It is thus described in the specification of the patent in terms of its object and principle of operation: ·

"The primary object of the present invention is the provision of a shock-absorbing guard under constant tension, and composed of a plurality of inherently resilient impact members arranged in substantial longitudinal alignment, and so connected, each to each at the ends, that an impact force against one of said members will be communicated to the connected resilient members adjacent each end thereof, thereby permitting each member in the train of connected elements, to absorb its quota of the shock.

"Another object of the invention is the provision of a resilient element, secured to a fixed support, and connecting the ends of adjacent impact members, whereby each connector element may add its inherent resilience as a factor in the absorption of any impactive force directed against any one of said members."

The appearance and construction of the road guard of the patent (advertised and sold under the trade-name "Resiliflex") are illustrated by the following photographs, taken from advertising matter of complainant introduced in evidence in the hearing below. The two small photographs show how the offset springs are attached to the sup-

porting posts and to the sections of the guard rail.

sion to the series when the latter is connected to said supports.

Complainant relies upon claims 5 to 10, inclusive, which are as follows:

"5. A road guard, comprising a plurality of spaced supports, a series of sheet metal strips connected end to end to provide a substantially smooth continuance surface, means to secure the series wholly to one side of the supports and to maintain the respective strips under tension.

"6. A road guard, comprising a plurality of spaced supports, a series of sheet metal strips connected end to end to provide a substantially smooth continuous surface, spring connectors to secure the ends of the adjacent strips together under tension and to the supports.

"7. A road guard, comprising a plurality of spaced supports, a series of sheet metal strips, means for connecting said strips end to end to provide a substantially smooth continuous surface throughout the series and for connecting the strips to the supports under tension.

"8. A road guard, comprising a series of sheet metal strips overlapping end to end and spring connectors between said ends for imparting a longitudinal tension to the strips when the latter are attached to supports.

"9. A road guard, comprising a plurality of spaced supports, a series of sheet metal strips overlapping end to end to provide a substantially smooth continuous surface, and spring connectors between said overlapping ends to impart a longitudinal ten-

"10. A road guard, comprising a plurality of spaced supports, a sheet metal band extending longitudinally and wholly to one side thereof, and means for maintaining said band under longitudinal tension."

It may or may not be significant that defendant developed his road guard shortly after a visit to the plant of complainant in Atlanta, Ga. Certain it is, however, that defendant's device operates upon the same principle as that of the patent, and accomplishes the same result, in the same way and by practically the same means. There is the same sort of guard rail consisting of a wide flexible steel band composed of strips connected in such way as to present a substantially smooth continuous surface, held away from the supporting posts by steel springs; there is the same principle of maintaining longitudinal tension in the guard rail; and there is the same connection of the members of the device in such way that each member adds its inherent resilience as a factor in the absorption of the force of any impact. Instead of connecting the ends of the sections of the guard rail to the opposite wings of the offset springs attached to the posts, however, and thus maintaining the normal longitudinal tension required, defendant bolts the ends of the offset springs together and the ends of the sections of guard rail to them, and maintains the requisite longitudinal tension by placing heavy helical springs at each end of the assembly. Slots in the offset springs allow several inches of

longitudinal movement and thus enable the helical springs at the ends to impart longitudinal tension to all of the sections of the guard rail. The structure and operation of defendant's guard is illustrated by the following photographs taken from his advertising matter introduced in evidence. The top photograph shows the offset spring, the manner in which it is attached to the intermediate posts, and the manner in which the ends of the spring are bolted together and the ends of the sections of the guard rail bolted to them. The other shows the end construction and how the helical springs are attached.

In the same advertising matter the operation of defendant's device is thus described by him under the heading "principle":

"At the moment of impact, the taut rail is driven into the form of an arc, requiring increased length. Additional length is acquired by the offset springs moving toward the impact. As the first springs move, they in turn move all other springs within the affected area, distributing the force of the impact over the entire assembly or to a point where the force is dissipated.

"The offset springs are greatly retarded in the longitudinal movement by compression springs in the end connections and by their own braking action or friction against the supporting posts. But before the total action of the end springs is reached the offset springs come to a complete stop, thus preventing the end posts from taking the entire shock.

"When the longitudinal movement of the offset springs stops, a rolling movement begins, bringing into resistance the full strength of each offset spring. Those springs nearest the impact are compressed, absorbing the transverse shock and protecting the supporting posts from direct shock. Since no traffic guard is stronger than its supporting posts, this feature is of the greatest importance."

There can be no question but that claim 10 of the patent reads on this device. Defendant's contention that the claim must be limited to the exact device disclosed by the specification and drawings cannot be sustained. As said by the Supreme Court in Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721, these "show a way of using the inventor's method, and that he conceived that particular way described was the best one. But he is not confined to that particular mode of use, since the claims of the patent, not its specifications, measure the invention."

And we think that no importance is to be attached to the fact that claim 10 was granted after claims 31 and 32 in the application had been disallowed. The rule is well settled, of course, that a patentee cannot broaden his claim by dropping from it an element which he was compelled to add in order to secure his patent; but nothing of that sort is involved here. The patentee is not seeking to broaden claim 10; and even if that claim were broader than the abandoned claims, which is not a fact, this would signify nothing. It is of no moment that in the course of proceedings in the Patent Office the rejection of narrow claims is followed by the allowance of one which is broader. Smith v. Snow, supra, 294 U.S. 1, at page 16, 55 S.Ct. 279, 79 L.Ed. 721. [3,4] We find nothing in the prior art to render claim 10 invalid; and, while we agree that it is to be interpreted in the light of the specification and drawings, we think that, as thus interpreted, it is broad enough to cover any road guard such as that of defendant comprising a sheet metal band maintained under longitudinal tension and attached to supports by means of offset springs so as to make use of the principle embodied in the patent.

And when the character of the invention is considered, it is clear that there is infringement of the other claims of the patent relied on, as well as of claim 10. We cannot agree with defendant or his experts that the patent is one for a mere improvement in a crowded art. The wire fence patents to which our attention is called dealt with problems of an entirely different character and furnished no aid to one seeking means of holding on a roadway, with minimum damage, a motorcar out of control and moving with a momentum of thousands of pounds. The road guard patents were for devices which had failed to solve the problem satisfactorily and which rendered little if any assistance in solving it. Lawson No. 1,449,578 provided as a guard rail a steel plate not under tension and incapable of longitudinal absorption of the force of an impact. The same is true of Dennebaum No. 1,600,165. The only movement possible for the guard rail which this patent provided was inwardly towards the supports. Kyle No. 1,643,123 showed nothing but a wire mesh attached to posts. Maudlin No. 1,549,139 was for a resilient wire mesh with means for keeping it under tension. Gledhill No. 1,643,555 and Doddridge No. 1,658,118 covered mere rigid metallic guard rails not under tension. A study of these patents shows conclusively what is otherwise established by the evidence, i. e., that, prior to the invention of complainant, repeated efforts had been made to construct a satisfactory road guard but without success. Whether complainant's invention be termed a pioneer or not, it unquestionably solved a problem for the solution of which others had sought in vain and made a substantial contribution to the safety of those who travel the highways. In such case, the law is well settled that he is entitled to a liberal construction of his claims and a liberal application of the doctrine of equivalents, to the end that he may not be deprived of the fruits of what he has done. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523; Wine Ry. Appliance Co. v. B. & O. R. Co. (C.C.A.4th) 78 F.(2d) 312, 317; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp. (C.C.A.4th) 40 F.(2d) 910; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele (C.C.A.4th) 35 F.(2d) 433; Frick Co. v. Lindsay (C.C.A. 4th) 27 F.(2d) 59, 62.

The use by defendant of helical springs at the ends of the guard rail, instead of the offset springs at the posts, for the purpose of maintaining the guard rail under tension, was the use of an obvious equivalent; and, with this exception, the construction of defendant's guard differs practically not at all from that of the patent. The offset springs at the posts, while shaped somewhat differently from those of the patent, perform the same function, except with respect to keeping the guard rail under tension; for it is abundantly established by the evidence, as the judge below has found and as the defendant says in its advertising matter, that they aid in absorbing the force of any blow against the guard rail. Much is made of the contention that the guard rail of defendant is one solid band of steel. Even if this were true, it would make no difference in the view which we take of the case; but, as a matter of fact, it is not true. The strips of which the guard rail is composed extend from post to post, just as in the case of the patent. They overlap each other and are fastened together and attached to the offset springs by the same bolts. The real difference in construction, therefore, is that complainant's strips are fastened to one wing of the offset springs, whereas defendant's are fastened to both wings, which are themselves fastened together at the same point. Certainly one who thus takes the heart of an invention cannot escape liability for infringement by such slight changes in form and such use of obvious equivalents. As was said by Mr. Justice Curtis speaking for the Supreme Court in Winans v. Denmead, 15 How. 330, 342, 14 L.Ed. 717:

"It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions; and the property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed. The answer is, my improvement did not consist in a change of form, but in the new employment of principles or powers, in a new mode of operation, embodied in a form by means of which a new or better result is produced; it was this which constituted my invention; this you have copied, changing only the form."

The rule was thus stated in the recent case of Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 50 S.Ct. 9, 12, 74 L. Ed. 147:

"There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930. A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed. 494. And even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom."

See, also, Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935; Morley S. Machine Co. v. Lancaster, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715; Leader Plow Co. v. Bridgewater Plow Co. (C.C.A. 4th) 237 F. 376; Crown Cork & Seal Co. v. Aluminum Stopper Co. (C.C.A. 4th) 108 F. 845; Frick Co. v. Lindsay, supra (C.C.A. 4th) 27 F.(2d) 59, 62; U. S. Slicing Machine Co. v. Wolf, Sayer & Heller (D.C.) 249 F. 245; Id. (C.C.A. 7th) 261 F. 195.

In Claude Neon Lights v. E. Machlett & Son et al. (C.C.A. 2d) 36 F.(2d) 574, 576, Judge Learned Hand pointed out that the doctrine of equivalents means more than that the language of claims shall be generously construed, being based upon the theory that the claim is not intended to be verbally definitive, but to cover the invention, which should to some extent be gathered from the disclosure at large. Summarizing his conclusion, with respect to the apparent conflict between the doctrine of equivalents and the doctrine that the patent is limited by the claims, he says: "On the one hand, therefore, the claim is not to be taken at its face—however freely construed—but its elements may be treated as examples of a class which may be extended more or less broadly as the disclosure warrants, the prior art permits, and the originality of the discovery makes desirable. On the other, it is not to be ignored as a guide in ascertaining those elements of the disclosure which constitute the 'invention,' and without which there could be no patent at all." In this case, there can be no question but that the road guard of defendant infringes all of the claims in suit when the doctrine of equivalents is given any consideration at all. As we said in Frick Co. v. Lindsay, supra, "Any patent, however, has some range of equivalents, unless form is made the indispensable thing. And the rule is especially applicable where the infringer takes the whole gist of the invention, as in this case."

There was no error and the decree appealed from will be affirmed.

Affirmed.